UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| KEITH CAVANAGH and | : | CIVIL CASE NO.: |
| LESLIE CAVANAGH | | |
| | | |
| v. | : | 3:14-cv-1938 (SRU) |
| | | |
| BIO-DYNAMIC, INC. and | | |
| COOLSYSTEMS, INC. | : | JUNE 18, 2018 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BIO-DYNAMIC'S MOTION FOR SUMMARY JUDGMENT

Defendant Bio-Dynamic, Incorporated ("Bio-Dynamic") in the above-entitled matter by its attorney moves, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and Local Rule 7(a) for summary judgment as a matter of law on all of Plaintiffs' Keith and Leslie Cavanagh's ("Plaintiffs") claims.

## I.  INTRODUCTION

This is a products liability claim under the Connecticut Products Liability Act, Conn. Gen. Stat. §§ 52-572m, et seq. ("CPLA"), originally brought by Complaint dated December 23, 2014 ("Complaint"). In Count One of their two-count Complaint, Keith and Leslie Cavanagh ("Plaintiffs") set forth claims that Bio-Dynamic is liable to Plaintiffs for an injury that Plaintiff Keith Cavanagh ("K. Cavanagh") allegedly sustained on November 9, 2013 ("Subject Incident"), while using a Game Ready Accelerated Recovery System S/N 214994 ("Subject Device") following a right knee surgery. The Subject Device is a cooling device with an optional compression feature, used in rehabilitation and home settings to speed recovery after surgery or trauma. The Subject Device consists of a control unit, a wrap designed for a specific body part,

1

and a connecting hose. See Exhibit[1] ("Ex.") 10[2] at 13-15; Ex. 16[3]; Ex. 17[4][5]. A user controls the level of cooling or optional compression via controls on the control unit. The Subject Device was manufactured by Defendant CoolSystems, Incorporated ("CoolSystems"), and delivered to K. Cavanagh by Bio-Dynamic prior to his scheduled knee surgery. Count Two adds a loss of consortium claim on behalf of Leslie Cavanagh ("L. Cavanagh").

Plaintiffs' Complaint asserts that the Subject Device was defective, and that its defective condition caused K. Cavanagh's injuries as described in the Complaint. Bio-Dynamic is entitled to summary judgment because: A) Plaintiffs have failed to adequately plead any cognizable, plausible theory of recovery under the CPLA; B) Plaintiffs' documentary evidence, if taken as true, cannot support any theory of liability beyond mere speculation; C) Plaintiffs have failed to establish the essential elements of a prima facie case under the CPLA by any theory; and D) Plaintiffs consequently cannot establish a prima facie cause of action for loss of consortium. Because there is no dispute as to any material facts of the case, Bio-Dynamic is entitled to summary judgment as a matter of law.

## II.  BACKGROUND

### A.  Medical Background

On September 10, 2013, K. Cavanagh underwent a physical examination by Dr. Timothy Greene M.D. ("Dr. Greene") after experiencing right knee pain, swelling and reduced mobility

---

[1] All exhibits referenced herein have been attached to and incorporated by reference in Bio-Dynamics' Local Rule 56(a)(1) Statement, filed herewith.
[2] Excerpts from Expert Report of Ashish Arora P.E. CFEI
[3] Bio-Dynamic's brochure advertising the Game Ready Accelerated Recovery System.
[4] Photograph of the Subject Device from February 13, 2017 inspection.
[5] The small device consisting of a clear tube and a gauge in the top left corner of Ex. 17 is a device to measure pressure and is not part of the Game Ready system.

from a buckling incident that occurred on his boat. See Ex. 1[6] at 1. Six days later, an MRI was performed which revealed a complete tear of the anterior cruciate ligament ("ACL"), a medial meniscal tear, a posterolateral tibial bone bruise, chondromalacia with focal osteochondral lesion of the medial femoral condyle, joint effusion and synovitis. Ex. 2[7] at 1-2. K. Cavanagh elected to undergo surgery on his right knee. See Ex. 3[8] at 99-101.

Prior to K. Cavanagh's surgery, Plaintiffs met with Dr. Greene to discuss his MRI, and they also spoke about post-operative recovery. Ex. 11[9] at 54-55; Ex. 12[10] at 56-58. On or about October 21, 2013, Dr. Greene filled out a prescription for a continuous passive motion machine ("CPM") and a Game Ready Accelerated Recovery System, which he faxed to Bio-Dynamic. See Ex. 5.[11] The CPM and the Subject Device were delivered to Plaintiffs' home by carrier. Ex. 11 at 56.[12] Subsequently, Lori Barger ("Barger") visited the Plaintiffs at their home, and instructed them on how to use the cooling feature of the Subject Device. Ex. 11 at 57-60; Ex. 12 at 65-70. Barger performed her duties as an independent contractor. Ex. 18[13] at 19-20. Plaintiffs testified that, at the time they were instructed by Barger on how to use the Subject Device, they

---

[6] Medical record from Orthopaedic & Neurosurgery Specialists, PC, by Dr. Greene, dated September 10, 2013.

[7] Medical record from Orthopaedic & Neurosurgery Specialists, PC, MRI Examination Report, dated September 16, 2013.

[8] Medical record from Greenwich Hospital, Operative Report, pp. 99-101, dated November 6, 2018.

[9] Excerpts from Plaintiff K. Cavanaugh's certified deposition transcript, taken on January 8, 2016.

[10] Excerpts from Plaintiff Leslie Cavanaugh's ("L. Cavanaugh") certified deposition transcript, taken on January 8, 2016.

[11] Prescription order form for Game Ready Accelerated Recovery System, for K. Cavanaugh, signed by Dr. Greene October 21, 2013

[12] In his deposition, K. Cavanaugh inaccurately notes that Dr. Greene's signature on the prescription ("Exhibit 5") is dated September 21, 2013. The prescription was dated by Dr. Greene and labeled "faxed" on October 21, 2013. Ex. 5.

[13] Excerpts from Barger's certified deposition transcript, taken on June 17, 2016.

knew how to use it and knew not to use the compression feature. Ex. 11 at 59-62, 66-70; Ex. 12 at 67-69, 153-154.

On November 6, 2013, approximately two months after his physical examination, K. Cavanagh underwent a right high tibial osteotomy plus ACL reconstruction. See Ex. 3 at 100. K. Cavanagh was discharged on November 7, 2013, with instructions that included prescriptions for medication, physical therapy, the CPM and the Subject Device. See Ex. 4[14] at 1-2 (referred to as "ice machine"); Ex. 13[15] at 29-36; Ex. 12 at 80-85. The first time that K. Cavanagh used the Subject Device was on November 7, 2013, the day he was discharged. Ex. 11 at 78-79, 82-83; Ex. 12 at 85-87. Following this initial use, K. and/or L. Cavanagh operated the Subject Device for almost three days, as frequently as twenty minutes on and twenty minutes off, without incident. Ex. 11 at 85-92; Ex. 12 at 88-94. Plaintiffs used the Subject Device for twenty minutes on and twenty minutes off for the first twenty-four hours, and at various other intervals thereafter. Ex 12 at 88-92.

On November 9, 2013, K. Cavanagh returned to the hospital, and reported that he had been recovering from his ACL surgery at home "using an ice machine with compression," and that he thought there was a "malfunction and the compression portion of the machine compressed his leg significantly." See Ex. 6[16] at 10. K. Cavanagh presented with increased swelling and pain in his right knee, drainage from the wound, fever symptoms and an elevated temperature. Id. Dr. Greene recommended undertaking a second surgery on K. Cavanagh's knee to irrigate and debride the knee and tibial wounds, and Plaintiffs indicated that they wished to

---

[14] Medical record from Greenwich Hospital, After Visit Summary, pp. 1-5, dated November 7, 2013.
[15] Excerpts from Dr. Greene's certified deposition transcript, taken on October 27, 2017.
[16] Medical record from Greenwich Hospital, Consultation and Operative Report pp. 10-19, dated November 9, 2018.

proceed. Id. at 11. That day, K. Cavanagh underwent a second surgery, in which his prior sutures were removed and the wounds in his knee were debrided and irrigated. Id. at 16. Hematomas were found at each of the wound sites, which were removed and cultured, and a wound drain was installed. Id.

On November 11, 2013, following his second knee surgery, K. Cavanagh was discharged with the same discharge instructions that he received following his first surgery. See Ex. 7[17]; c.f. Ex. 4; Ex. 12 at 109-111. During the period of time that K. Cavanagh was in the hospital for the second surgery, a representative from Bio-Dynamic came to Plaintiffs' home and replaced the Subject Device with a second similar Game Ready Accelerated Recovery System.[18] Ex. 12 at 106-107. K. Cavanagh used this second Game Ready device as part of his post-operative rehabilitation following his second surgery, without incident. Ex. 12 at 109-112.

## B.   Device Background

The Subject Device is a Game Ready System manufactured by CoolSystems, and is a FDA Class II medical device intended for use in physical therapy applications and to treat post-surgical acute injuries to reduce edema, swelling and pain. See Ex. 8[19] at 39-41; Ex. 10 at 11-15. The Subject Device is a cooling device with an optional compression feature that is applied to "areas of the patient's body via a wrap designed for the purpose. The wrap is attached to the control unit via a connecting hose which carries air and re-circulating water lines." Ex. 10 at 11, 13-15; Ex. 16; Ex. 17.  The Game Ready system provides controlled cold therapy and optional intermittent compression by controlling fluid flow and air pressure through a wrap that is

---

[17] Medical record from Greenwich Hospital, After Visit Summary, pp. 1-4, dated November 11, 2013.
[18] Bio-Dynamic was notified of the alleged malfunction of the Subject Device by a phone call that K. Cavanaugh made on the morning of November 9, 2013. Ex. 11 at 104-106.
[19] Excerpts from Expert Report of Dr. John D. Jarrell PhD, PE

specially designed for a specific body part or location. The wrap is comprised of a sleeve and heat exchanger. Cooling is provided by circulating ice water from the control unit through the connector hose to the wrap. Optional compression is provided by an intermittent-cycling pneumatic pump *that pumps air from the control unit* through the connector hose to the wrap. The Game Ready system allows the user to adjust the amount of cooling, the existence and amount of compression and the treatment time using an interface on the control unit. Id.

### C.  **Expert Opinions**

In support of Plaintiffs' claim that the Subject Device is defective, Plaintiffs disclosed Dr. John D. Jarrell PhD, PE ("Jarrell") as an expert witness. Jarrell was retained "to review documentation and inspect devices regarding the failure of a Game Ready cold therapy system." Ex. 8 at 1; Ex. 14[20] at 59-60. To form a basis of his opinions, Jarrell reviewed discovery materials, medical records, testimony of K. and L. Cavanagh, inspected multiple exemplar Game Ready devices provided by CoolSystems and, along with CoolSystems' experts, participated in two separate inspections of the Subject Device on February 13 and August 7, 2017. Ex. 8 at 1, 3. Ex 9[21] 4-6. Jarrell's ultimate opinion as to how K. Cavanagh's injury could most likely have occurred as described in the Complaint is that the Subject Device's pressure transducer failed due to an undetermined intermittent cause ("Unsafe Condition A"). Ex. 8 at 10-11; Ex. 14 at 123-126.

CoolSystems retained Ashish Arora P.E. CFEI ("Arora") and Dr. Glenn E. Vallee Ph.D., P.E. ("Vallee") to review discovery documents, testimony, and study, analyze and test the Subject and exemplar devices to determine whether the Subject Device failed in the manner alleged in the Complaint. Ex. 9 at 2-3, Ex. 10 at vii-viii. CoolSystems' experts both opined inter

---

[20] Excerpts from Jarrell's certified deposition transcript, taken on November 13, 2017.
[21] Excerpts from Expert Report of Dr. Glenn E. Vallee Ph.D., P.E

alia that: 1) the design of the Game Ready System is not defective nor unreasonably dangerous to consumers; 2) there is no evidence that the device malfunctioned; 3) when operated in the "no-pressure" setting the Game Ready System does not generate any measurable compression, even if there is a failure of the pressure transducer and/or back-up pressure switch; and 4) K. Cavanagh's injury could not have occurred as Plaintiffs claim, or as Jarrell describes in his report. Ex. 9 at 10-11, Ex. 10[22] at vii-viii.

### III.    LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Anderson"). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, supra, 477 U.S. 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. Scott v. Harris, 550 U.S. 372, 380 (2007).

---

[22] Excerpts from Expert Report of Ashish Arora P.E. CFEI

IV.    <u>**ARGUMENT**</u>

Bio-Dynamic is entitled to summary judgment because: A) Plaintiffs have failed to adequately plead any cognizable theory of recovery under the CPLA even by notice pleading standards; B) Plaintiffs' documentary evidence, if accepted as true, cannot support any plausible theory of liability; C) Plaintiffs have failed to establish the essential elements of a prima facie case under the CPLA by any theory; and D) Plaintiffs consequently cannot establish a prima facie cause of action for loss of consortium.

A.    <u>**Plaintiffs Failed to Sufficiently Plead any Cognizable Legal Theory of Liability as is required under Fed. R. Civ. P. 8(a) and the CPLA.**</u>

Plaintiffs' Complaint alleges no legal theories of liability under the CPLA that satisfy the pleading standard of Fed. R. Civ. P. 8(a), and therefore, judgment must be granted as a matter of law. While the CPLA establishes the sole remedy for a plaintiff's product liability claim, the CPLA was not intended "to alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail." <u>LaMontagne v. E.I. Du Pont De Nemours & Co.</u>, 41 F.3d 846, 855 (2d Cir. 1994) ("<u>DuPont</u>"). The CPLA "does not preempt all common law theories of product liability; rather, 'the CPLA bars separate common law causes of action in product liability cases.'"<u>Walters v. Howmedica Osteonics Corp</u>. 676 F. Supp. 2d 44, 48 (D. Conn. 2009) ("<u>Walters</u>") (quoting <u>Densberger v. United Technologies Corp.</u>, 297 F.3d 66, 70 (2d Cir. 2002)). Where a plaintiff brings a single cause of action pursuant to the CPLA, that cause of action may include several common law theories of liability, such as strict liability, negligence and breach of warranty. <u>DuPont</u>, <u>supra</u>, 41 F.3d 855; <u>see</u> <u>also</u> Conn. Gen. Stat. § 52-572n(a). Such sub-claims are addressed independently, and "retain their character as they existed at common law" even

when brought as a single CPLA claim. Walters, supra, 676 F. Supp. 48-49 (noting that a plaintiff may bring one cause of action under the CPLA which includes different grounds for relief such as strict liability, negligence and breach of warranty). Thus, while "a plaintiff may not assert a cause of action against the seller of a product for harm caused by the product except within the framework of the CPLA," Dupont, supra, 41 F.3d 855, the CPLA claim is assessed pursuant to the requirements of the various common-law requirements subsumed by the CPLA, as the CPLA "does not itself spell out the elements of the types of claims it consolidates." Id. at 856.

Under federal notice pleading requirements, a plaintiff must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). Such a statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). A "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 548 (2007) (internal citations omitted). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).

District of Connecticut courts sitting in diversity have determined that federal notice pleading standards require that plaintiffs affirmatively plead the various legal theories of CPLA liability, as sub-claims pursuant to a unified product liability claim. See Savona v. Gen. Motors Corp., 640 F. Supp. 6, 9-10 (D. Conn. 1985) ("The proper way to plead a product liability claim under the Act is to allege all theories of recovery, perhaps in separate paragraphs, under one

9

count of the complaint"). The purpose of this requirement is to put defendants on notice as to which theories of liability the plaintiffs seek recovery, and the grounds upon which they rest. From a policy perspective, to permit a plaintiff to generally allege a violation of the CPLA without any specificity as to what legal theories of liability he intends to prove, would require a defendant to speculate as to how they are allegedly liable, and make it virtually impossible to prepare a defense against any and all potential theories presented under the CPLA.

The allegations contained in Plaintiffs' Complaint fail to meet the minimum standard under Fed. R. Civ. P. 8(a) and Twombly. Plaintiffs invoke a statutory cause of action under the CPLA for a defective product, as is their exclusive remedy. However, Plaintiffs' Complaint contains no allegations that put Defendants on fair notice of what legal theories of liability Plaintiffs intend to present at trial, or raise their right to relief above a speculative level as required by Twombly.

Plaintiffs only allegation of a cognizable legal theory of liability is that "[a] substantial factor causing the malfunction of the Game Ready device and the injuries was BioDynamic's negligent testing, manufacture, construction, preparation, assembling, testing, distribution and/or sale of the Game Ready device in question." Compl.[23] at ¶23. This mere legal conclusion is insufficient to plead a cause of action under Twombly. "Factual allegations must . . . assert a cause of action with enough heft to show entitlement to relief by alleging . . . enough facts to state a claim to relief that is plausible on its face." Twombly, supra, 550 U.S. 555, 570; see also Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in Twombly and Iqbal obligates the plaintiff to "provide the grounds of his

---

[23] References to the Complaint are cited as "Compl. ¶ __".

10

entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (internal citations omitted).

Plaintiffs' attempt at asserting a negligence claim against Bio-Dynamic is exactly the type of pleading that Twombly rejects as insufficient. Paragraph 23 of Plaintiffs' Complaint does not set forth any factual basis under which Bio-Dynamic was allegedly negligent in testing, manufacturing, constructing, preparing, assembling, testing, distributing and/or selling the Subject Device, such that Plaintiffs' right to relief is plausible on its face. Compl. at ¶23. This allegation is merely a legal conclusion and a recitation of some of the potential causes of injury permitted in a "product liability claim," as enumerated in General Statutes § 52-572m(b).

Plaintiffs' Complaint consists only of a broad allegation that the Subject Device was defective, and the defect caused K. Cavanagh's injury, coupled with a recitation of possible ways that Bio-Dynamic could have been negligent, devoid of any factual allegations. These allegations fail to raise Plaintiffs' right to relief, under any legal theory of liability subsumed by the CPLA, above a speculative level, and fail to assert any cause of action "with enough heft to show entitlement to relief that is plausible on its face." Twombly, supra, 550 U.S. 555, 570. Therefore, under Fed. R. Civ. P. 8(a) and the Twombly pleading standard, Plaintiffs' Complaint fails to apprise Bio-Dynamic of any plausible grounds for relief under the CPLA, and thus fails to state a claim and must be disposed of as a matter of law.

**B.     Jarrell's Opinions are Inadmissible under Rule 702 of the Federal Rules of Evidence and _Daubert_.**

In support of Plaintiffs' claim that the Subject Device is defective, Plaintiffs disclosed Dr. Jarrell as an expert witness. Jarrell's opinion is inadmissible because it is based solely on fictional, hypothetical scenarios devised to back into Plaintiffs' account of the Subject Incident, rather than on any reliable scientific methodology or logical relevance to the undisputed facts in

this case. Rule 702 of the Federal Rules of Evidence ("Fed. R. Evid.") requires a valid scientific connection to the inquiry as a prerequisite to admission. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993); see also Karavitis v. Makita U.S.A., Inc., 243 F. Sup. 3d 235, 240-41 (D. Conn. 2017) (citing Fed. R. Evid. 702: "[e]xpert witness testimony is admissible only if: (1) 'the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;' (2) 'the testimony is based upon sufficient facts or data;' (3) 'the testimony is the  product of reliable principles and methods;' and (4) 'the expert has reliably applied the principles and methods to the facts of the case'"). Where the proponent of expert testimony cannot demonstrate that the opinion of the proffered expert is grounded upon "a traceable, analytical basis in objective fact", the opinion is inadmissible. Bragdon v. Abbott, 524 U.S. 624, 653 (1998).

In his testimony, Jarrell admitted that without exclusive reliance on selected portions of Plaintiffs' account of the Subject Incident, he has no opinion that the Subject Device malfunctioned *at all*. Ex. 14 at 60-62. Therefore, Jarrell's opinion is inadmissible under Daubert to prove that the subject device is in anyway defective, as his opinions are: a) not supported by any acceptable scientific methodology; b) any methodology Jarrell did develop was not applied to the facts of the case; and c) his opinions are purely speculative and based on conjecture. Without Jarrell's testimony, Plaintiffs' cannot make out a prima facie case of products liability as to Bio-Dynamic, and their claims fail as a matter of law. See  White v. Mazda Motor of America, Inc., 139 Conn. App. 39, 49-50, 54 A.3d 643 (2012) ("we … consistently have held that 'expert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors.'")

### i. *Jarrell's opinion is not supported by any acceptable scientific methodology.*

Jarrell's opinion as to how the Subject Device most likely caused K. Cavanagh's injuries, is that an undetermined intermittent failure of the device's pressure transducer caused sustained overpressurization of the device wrap, causing the injuries as described in Plaintiffs' deposition testimony and medical reports. See Ex. 14 at 123-126, 129, 134-135. To form the basis of his opinion, Jarrell relied on testimony from K. and L. Cavanagh and Dr. Greene's reports, which are wholly based on K. Cavanagh's account of the Subject Incident. Ex. 14 at 122-123; see also Ex. 13. at 58-64. From K. Cavanagh's account of the Subject Incident, Jarrell developed three hypothetical scenarios that he contends replicate the Plaintiffs' account of the Subject Incident. Ex. 8 at 10-11; Ex. 14 at 90-93, 122. Out of the three simulations that he devised, Jarrell eliminated two scenarios because he thought "Unsafe Condition B" was not likely, and the wrap would have "exploded" had the Subject Device malfunctioned according to "Unsafe Condition C." Ex. 14 at 123-125. Jarrell opined that an unspecified and untraceable intermittent malfunction of the pressure transducer was the only way the Subject Device could have malfunctioned in accord with Plaintiffs' account of the Subject Incident. Ex. 8 at 10; Ex. 14 at 123-126, 129, 134-135. Jarrell contends that he simulated this event in the Subject Device by disassembling and manually blocking the transducer assembly after startup, thus disabling the device and causing overpressurization ("Unsafe Condition A"). Ex 8 at 10; Ex. 14 at 93-95. In the absence of any physical evidence of a defect, Jarrell testified that had no independent opinion that the subject device did in fact malfunction as claimed in the Plaintiffs' Complaint, without sole reliance on Plaintiffs' testimony, and Dr. Greene's reports. Ex. 14 at 61-62, 122. Jarrell's manual simulation of a failure of the Subject Device's pressure transducer, and his inability to identify any direct physical evidence of an actual design or manufacturing defect, lead him to

opine that it is possible that K.Cavanagh's alleged injury resulted from an undetectable, unspecified intermittent failure of the device. Ex. 14 at 128-130; 134-135.

Jarrell's opinion cannot be admissible because it is based on a series of simulations, by which he manually disables components within both the Subject and exemplar devices, in attempt to replicate Plaintiffs' account of the Subject Incident. Plaintiffs offer no facts that suggest that this methodology accurately reflects the conditions encountered by Plaintiffs the night of the Subject Incident. A "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009) ("Zerega Ave."). Expert opinions must likewise be excluded where the court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U. S. 136, 146, 118 S.Ct. 512 (1997).

Jarrell ran exemplar devices and the Subject Device in all pressure settings multiple times without incident, observing them performing to specifications when operated in a fully assembled state. Ex. 9 at 6-9; Ex. 14 at 106-107, 163-164. Jarrell observed no physical evidence of a blockage or evidence of any other failure of the Subject Device's pressure transducer during any of the inspections that were performed. Ex. 14 at 103-104, 128-129. Jarrell's report itself states that only after observing the normal functioning of the Game Ready System, did he "attempt to reproduce the condition described in the complaint." Ex. 8 at 9-10. Apparently, faced with no direct physical evidence of a defect in the Subject Device, Jarrell focused exclusively on only portions of the Plaintiffs' account of the Subject Incident, and sought to replicate the alleged behavior of the Subject Device by manually disabling its component parts. Ex. 14 at 87:7-95:19.

14

This leads Jarrell to the conclusion that only an undetermined intermittent event could cause the device to act in the way reported by the Plaintiffs. Ex. 14 at 60-62, 100-104, 134-135.   The only scenario presented by Jarrell is implausible because the device would have had to be operating in the compression mode and the Plaintiffs testified they did not use the compression mode at any time.

Therefore, Jarrell's opinions are implausible, are not based on any reliable methodology and are irrelevant as they are not founded on "a traceable, analytical basis in objective fact", but rather, based solely on cherry picked parts of Plaintiffs' account of the Subject Incident.  As for Jarrell's opinion, there is "simply too great an analytical gap between the data and the opinion proffered" for it to be deemed admissible. Gen. Elec. Co. v. Joiner, supra, 522 U.S. at 146.

       ***ii.***       ***Any methodology Jarrell did develop was not applied to the facts of the case.***

Jarrell's faulty methodology produced a result which was not consistent with the Plaintiffs' version of events. In no way does Jarrell's methodology reflect the conditions under which Plaintiffs operated the Subject Device. In order for Jarrell's transducer failure to occur and cause  the wrap to overpressurize, the Subject Device would have to be set to one of the three compression modes. Ex. 9 at 9; Ex. 10 at vii-viii.  Plaintiffs did not disassemble or disable the Subject Device, ***and they never used it on any setting other than "no-pressure" setting.*** Ex. 11 at 69-70; Ex. 12 at 67-69, 112, 153-154; Ex. 15[24] at 146-147. Jarrell's simulations produced no evidence of either the Subject Device nor any exemplar devices generating any pressure in the device wrap when operated in the "no-pressure" setting, even when the device was artificially, manually disabled. Ex. 9 at 9; Ex. 10 at vii-viii, 30-31, 42, 65 (Table 8).

---

[24] Excerpts from Arora's certified deposition transcript, taken on March 29, 2018.

Jarrell's opinion that K. Cavanagh's injuries were caused by Unsafe Condition A is contrary to the Plaintiffs' own testimony, as neither the Subject nor exemplar devices produced any measureable compression when set to "no pressure" mode, even when an intermittent transducer failure was simulated. Id. Therefore, Jarrell's opinion is eviscerated by the undisputed material facts of this case, and must be rejected as implausible, as it could never assist a trier of fact to understand the evidence in the case or determine a fact at issue.

### iii.      Jarrell's opinions are speculative and based solely on conjecture.

Jarrell's methodology fails to establish a defect in the Subject Device. Virtually any electric and/or mechanical system will fail if it is intentionally disabled, and Jarrell's demonstrations of alleged "Unsafe Conditions" found on pages 10-11 of his report do not establish, with a reasonable degree of scientific probability, how K. Cavanagh's injury occurred. Jarrell asserts that the opinions contained in his report are "made to a reasonable degree of scientific certainty." Ex. 8 at 1. However, he admits in his deposition that, given that there was no direct evidence of a failure of the Subject Device, he can't opine on the probable cause of the alleged intermittent failure of the Subject Device with any degree of certainty. Ex. 14 at 103, 129-130, 134-135.

Jarrell's opinion that Unsafe Condition A caused K. Cavanagh's injuries is based on theoretical simulations of a transducer failure, and Jarrell cannot opine that, more likely than not, any specific intermittent failure of the transducer occurred. Jarrell has merely devised fictional simulations of an unspecified intermittent failure by relying solely on selected portions of Plaintiffs' account of the Subject Incident, while conveniently ignoring parts of their testimony which were inconsistent with his opinion. As is the Court's responsibility in the fulfillment of its "gatekeeper" role, the admissibility of this opinion must be assessed before Plaintiffs are allowed

16

to present it to a jury. <u>Daubert</u>, 509 U.S. 589. When analyzed under the requirements of controlling case law it is apparent that Jarrell's opinion is not based on "a traceable, analytical basis in objective fact", but rather is "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." <u>Zerega Ave.</u>, <u>supra</u>, 571 F.3d at 214; <u>see</u> <u>also</u> <u>Shatkin v. McDonnell Douglas Corp.</u>, 727 F.2d 202, 208 (2d Cir. 1984) (the Court has the discretionary right under Fed. R. Evid. 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.) Therefore, Jarrell's opinion is speculative and inadmissible under Fed. R. Evid. 702 and <u>Daubert</u>.

Without an admissible expert opinion, Plaintiffs' cannot establish a prima facie case of products liability. <u>Koutsoukos v. Toyota Motor Sales, U.S.A., Inc.</u>, 137 Conn.App. 655, 659, 49 A.3d 302, <u>cert. denied</u>, 307 Conn. 933, 56 A.3d 714 (2012) ("where complex products are concerned, an ordinary consumer may not be able to form expectations of safety . . . Generally, absent direct evidence of a product defect, [i]f lay witnesses and common experience are not sufficient to remove [a] case from the realm of speculation, the plaintiff will need to present expert testimony to establish a prima facie case." (Citation omitted; internal quotation marks omitted.)) Therefore, for the reasons stated herein, Jarrell's opinions are speculative and inadmissible. Without an admissible expert opinion, Plaintiffs cannot establish a prima facie case under the CPLA, and Bio-Dynamic is entitled to judgment as a matter of law.

**C.**     **Even if Jarrell's Opinion is Admissible, Plaintiffs Fail to Establish the Essential Elements of Any Cause of Action under the CPLA as to Bio-Dynamic.**

   ***i.***     ***Plaintiffs Fail to Establish the Essential Elements of a Cause of Action for Strict Products Liability under the CPLA.***

As stated in Section IV. A., Plaintiffs' pleadings fall short of the requirements of Fed. R. Civ. P 8(a) and the Twombly plausibility standard. Consequently, they fail to put Bio-Dynamic on notice of the legal theories of liability under which they seek relief, and the factual grounds of those claims. Plaintiffs allege that "a substantial factor causing Keith Cavanagh's injuries were Bio-Dynamic's and/or CoolSystems' violation of Connecticut General Statutes §§ 52-572m-52-572q." Compl. at 4:¶21. A potential theory of liability under the CPLA, although not specifically pled, or supported with any factual allegations, is strict products liability.

"[I]n order to recover under the doctrine of strict products liability in tort the plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." (Internal quotation marks omitted.) Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 214, 694 A.2d 1319 (1997). "In a products liability action, the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries." (Internal quotation marks omitted.) Haesche v. Kissner, 229 Conn. 213, 218, 640 A.2d 89 (1994).

Based on the undisputed material facts in this case, Plaintiffs cannot establish the essential elements to prove a cause of action for strict product liability under the CPLA. Specifically, Plaintiffs' cannot meet their burden of establishing that: a) the Subject Device was

in a defective condition and unreasonably dangerous to the Plaintiffs; b) that the defective condition (of which there was none) existed at the time that the Subject Device left Bio-Dynamic's control; and c) that the defect was the proximate cause of K. Cavanagh's injuries as alleged. There being no genuine issue of material fact, Bio-Dynamic is entitled to judgement as a matter of law.

        a)        *Plaintiffs have produced no direct physical evidence that the Subject Device contains a specific manufacturing or design defect.*

Plaintiffs have produced no direct physical evidence that the Subject Device contains a specific manufacturing or design defect, therefore Plaintiffs' claims fail as a matter of law. Jarrell failed to find any direct evidence of any defect in the Subject Device, and instead he resorted to selective reliance on Plaintiffs' testimony to develop a hypothetical and implausible theory of an intermittent failure. Without reliance on Plaintiffs' testimony and medical records Jarrell testified that he had no independent opinion that the subject device did in fact malfunction as claimed in the Plaintiffs' Complaint. Ex. 14 at 60-62.

Jarrell first inspected an exemplar Game Ready GR1 device (S/N 30221039) ("GR1") provided by CoolSystems. Ex. 8 at 9. Jarrell operated the GR1 device in all pressure settings, without noting any malfunction. Id. Subsequently, Jarrell "attempted to reproduce the conditions described in the complaint" using GR1. Ex 8 at 10; Ex. 14 at 87-90. Jarrell disassembled and manually disabled the GRI in various ways, in an attempt to simulate the Plaintiffs' account of the Subject Incident, and the allegations of the Complaint. As noted herein (see Section IV. B.), while this faulty methodology is irrelevant in proving that a specific manufacturing or design defect proximately caused K. Cavanagh's injuries as alleged, it lead Jarrell to opine that "Unsafe Condition A" would produce the sustained overpressurization that would support the Plaintiffs' theory of the case. Jarrell testified that the device would fail when there is a blockage or

malfunction of the transducer. Ex. 14 at 121. As stated herein "Unsafe Condition A" was simulated in the Subject Device by blocking the tube to the transducer after startup. Despite this being the only scenario that Jarrell opines is at all likely to have caused the overpressurization, this requires the Subject Device to be in a compression mode and he points to no physical evidence that the transducer was blocked, or the Subject device malfunctioned in any way at the time of the alleged injury. Ex. 14 at 103, 122, 128-129. Jarrell opined that absent physical evidence of a malfunction, the Subject Incident was likely caused by an undetermined intermittent event. Ex. 14 at 134-135. However, he could not state with any reasonable degree of scientific probability what specific intermittent event allegedly caused "Unsafe Condition A." Id.

Despite Jarrell's opinion that an intermittent failure could hypothetically cause the pressure transducer to malfunction, he never observed overpressurization activity with respect to the Subject Device, except while the device was in compression mode when he simulated an intermittent failure of the transducer by manually disabling it. Ex. 8 at 13-14, Ex. 9 at 6-7; Ex. 14 at 106-107, 163-164.

Jarrell was not able to find any direct physical evidence of a specific defect in the Subject Device. Jarrell's purported ability to artificially simulate an unexplained failure which may have been consistent with portions of Plaintiffs' account, is insufficient to establish a specific design or manufacturing defect. This is an essential element in a cause of action for strict products liability. Therefore, Plaintiffs cannot establish a prima facie case for strict products liability, and consequently Bio-Dynamic is entitled to judgment as a matter of law.

      *b)*     *The undisputed documentary evidence shows that the Subject Device was not defective at the time it left Bio-Dynamic's control.*

K. Cavanagh testified at his deposition that the Subject Device was delivered by a carrier to his home sometime in early November, prior to his surgery. K. Cavanagh also testified that "a

day or two later" Barger came to Plaintiffs' home to instruct him and L. Cavanagh on the proper use of the machine. Ex. 11 at 57-58. Barger instructed K. and L. Cavanagh how to use the machine, and performed one or two demonstrations that involved running the machine for approximately five minutes. Ex. 11 at 58-60, 62-63; Ex. 12 at 65-66, 69-70. Neither Plaintiff testified that the Subject Device malfunctioned when it was in their possession, at their meeting with Barger. Furthermore, Plaintiffs testified that K. Cavanagh used the Subject device post-operatively for almost three days without ever experiencing a malfunction or defect, or observing any erratic behavior or intermittent events. Ex. 11 at 78-79, 82-84, 85-87,92; Ex. 12 at 85-94. At subsequent tests of the Subject Device, it was never observed to be acting erratically, never experienced an intermittent failure and never performed outside its specifications when not in compression mode ***and*** manually disabled by Jarrell.

Plaintiffs can point to no admissible evidence that the Subject Device was in a defective or unreasonably dangerous condition when Plaintiffs took possession of it, and therefore any claim under a theory of strict products liability fails as a matter of law.

c)      *Plaintiffs cannot point to admissible evidence that a defect in the Subject Device proximately caused K. Cavanagh's alleged injury.*

Plaintiffs cannot point to any evidence to prove that K. Cavanagh's alleged injuries were proximately caused by a design or manufacturing defect as alleged in the Complaint, therefore Plaintiffs' claims must fail as a matter of law. Viewing the facts in the light most favorable to the Plaintiffs, both K. and. L. Cavanagh repeatedly testified that they knew not to use the Subject Device's compression feature, and never in fact activated any of the compression modes. It is undisputed that neither the Subject nor any of the exemplar devices tested have ever been observed generating ***any measurable compression*** in "no-pressure" mode.

Jarrell has no independent scientific opinion on whether the Subject Device failed as claimed. Ex. 14 at 60-62. Relying solely on selected portions of Plaintiffs' account of the Subject Incident and ignoring others, Jarrell sought to simulate the sustained overpressurization reported by Plaintiffs "with[ his] observations of overpressurization which [he] produced." Id. While falling well short of the standards of admissible expert testimony, Jarrell's opinion also ignores the material fact *that Plaintiffs testified that they knew not to use the compression feature on the Subject Device and in fact only used the device in "no-pressure" setting*. Ex. 11 at 69-70; Ex. 12 at 67-69, 112, 153-154; Ex. 15 at 146-147. Plaintiffs never experienced any compression from the Subject Device allegedly until the Subject Incident, and never observed it switching out of "no-pressure" mode on its own. Ex. 11 at 78-79, 82-84, 85-89, 92; Ex. 12 at 94-95, 85-94. Nor has that condition been reproduced in any prior incident or any simulation.

When used in "no-pressure" setting, neither the Subject Device nor any of the exemplar devices tested ever generate measurable compression in the wrap, even when the device was disabled. Ex. 9 at 9: Ex. 10 at vii-viii, 30-31, 65 (Table 8), 42 ("testing performed on the control unit indicates that even if the pressure transducer checks are bypassed and an artificial failure of the transducer is simulated by blocking the transducer inlet tube, the control unit never turns the air pump on when operating in 'No Pressure' mode and no pressure is created in the wrap in this mode of operation"), 65 (Table 8). Furthermore, in order to change the pressure setting, the Subject Device would have to be turned off and restarted in the new compression mode, which Plaintiffs testified they *never* did.  Ex. 11 at 69-70; Ex. 12 at 67-69, 112, 153-154; Ex. 15 at 146-147.

Plaintiff's set forth no evidence that the Subject device is defective and in fact failed in the manner alleged in the Complaint and in Plaintiffs' testimony. The undisputed facts show that

Plaintiffs did not use the Subject Device in any compression mode at any time. There is no documentary evidence that the Subject Device generates any compression in the wrap, even during the artificial simulation of an alleged intermittent failure, when it is run in the "no-pressure" setting, which Plaintiffs testify was the only setting in which they operated the Subject Device. Ex. 9 at 9; Ex. 10 at vii-viii, 30-31, 42, 65 (Table 8). There is no genuine dispute that the Subject Device wrap will not pressurize when in "no pressure mode, therefore a defect in the Subject Device could not have proximately caused K. Cavanagh's injuries as claimed. Accordingly, there is no theory of strict products liability under which Plaintiffs can recover and Plaintiffs' claims must fail as a matter of law.

Plaintiffs cannot establish the essential elements of an action for strict products liability because: a) there is no direct physical evidence of a design or manufacturing defect in the Subject Device; b) the Subject Device contained no defect at the time that the it left Bio-Dynamic's control; and c) no defect in the Subject Device was the proximate cause of K. Cavanagh's injuries as alleged. There being no genuine issue of material fact, Bio-Dynamic is entitled to judgement as a matter of law.

### ii.    Plaintiffs Fail to Establish the Essential Elements of a Negligence Action under the CPLA as to Bio-Dynamic.

Plaintiffs allege "a substantial factor causing the malfunction of the Game Ready device and the injuries to Keith Cavanagh was Bio-Dynamic's negligent testing, manufacture, construction, preparation, assembling, testing, distribution and/or sale of the Game Ready device in question." Compl. at ¶23. The "CPLA does not appear to govern the elements of a products liability action for negligent marketing of a defective or dangerous product--indeed, it is silent on the subject. However, it is clear that the requirements of duty, causation and foreseeability applicable to ordinary negligence actions are also applicable to negligence claims against product

manufacturers." <u>Lamontagne v. E.I. du Pont de Nemours & Co.</u>, 834 F. Sup. 576, 592 (D. Conn. 1993).

Based on the undisputed material facts in this case, Plaintiffs cannot establish the essential elements proving a cause of action for negligence under the CPLA. Specifically, Plaintiffs' cannot meet their burden of establishing that  Bio-Dynamic breached its duty to Plaintiffs, and that any breach of Bio-Dynamic's duty to Plaintiffs, of which there is none, proximately caused K. Cavanagh's injury as alleged.

As stated in Sections IV.C.i.a and IV.C.i.b herein, Plaintiffs have set forth no documentary evidence that the Subject Device was in any way defective when Plaintiff's took possession of it, therefore, Plaintiffs cannot prove that Bio-Dynamic breached any duty to them. The Subject Device operated within its specifications at all times prior to, and subsequent to, the Subject Incident. Plaintiffs' expert opinion that the Subject Device is in fact defective, and malfunctioned in the way claimed is speculative, and based solely on selective reliance on Plaintiffs' account, and is inconsistent with the basic undisputed operation of the Subject Device. No reasonable jury could find that Bio-Dynamic breached a duty to Plaintiffs. Therefore, Plaintiffs cannot make out a prima facie case for negligence, and Bio-Dynamic is entitled to summary judgment as a matter of law.

> iii.   ***Plaintiffs Fail to Establish the Essential Elements of a Breach of Warranty Action under the CPLA as to Bio-Dynamic.***

Plaintiffs have failed to plead any basis for a breach of warranty claim. The CPLA is silent as to the elements of a cause of action for breach of warranty. However, the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC"). <u>Lamontagne v. E.I. du Pont de Nemours & Co.</u>, 834 F. Sup. 576, 594 (D. Conn. 1993) governs actions for breach of warranty.  There was no breach of warranty, express or implied, claimed by

the Plaintiffs. In the event that Plaintiffs had pled under an implied warranty theory, two specific sections of the CUCC which govern implied warranties, arising from the sale of goods, are informative. The first, Conn. Gen. Stat. § 42a-2-314, states in pertinent part that: "unless excluded or modified as provided by section 42a-2-316, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind . . ." The second, Conn. Gen. Stat. § 42a-2-315, states that: "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose."

Based on the undisputed material facts in this case, Plaintiffs cannot establish the essential elements of a breach of warranty claim under the CPLA. Specifically, Plaintiffs' cannot meet their burden of establishing that Bio-Dynamic failed to provide merchantable goods to the Plaintiffs as the Subject Device contains no established defects (see Sections IV.C.i.a and IV.C.i.b infra).

While not adequately pled by Plaintiffs, Plaintiffs cannot establish the essential elements of a breach of warranty claim under the CPLA. Therefore, all Plaintiffs' claims must fail as a matter of law.

### D.     Plaintiffs Cannot Establish a Prima Facie Cause of Action for Loss of Consortium

Plaintiffs' Second Count of their Complaint alleges a loss of consortium claim, on behalf of L. Cavanagh, derivatively based on their CPLA claim. For all the reasons set forth above, Plaintiffs cannot establish a prima facie case under the CPLA, pursuant to any legal theory of liability.  Consequently,  their Second Count fails as a matter of law as well.

## V.   <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs cannot establish a prima facie case under the CPLA pursuant to any legal theory of liability. Bio-Dynamic is entitled to summary judgment because: A) Plaintiffs have failed to adequately plead any cognizable or plausible theory of recovery under the CPLA even by notice pleading standards; B) Plaintiffs' expert cannot support any plausible theory of liability beyond mere speculation; C) Plaintiffs have failed to establish the essential elements of a prima facie case under the CPLA by any theory; and D) Plaintiffs consequently cannot establish a prima facie cause of action for loss of consortium.

There being no genuine dispute regarding the material facts of the case, Bio-Dynamic is entitled to judgment as a matter of law as to all counts of Plaintiffs' Complaint.


THE DEFENDANT,
BIO-DYNAMIC, INC.


By: /s/ Karen Baldwin Kravetz
Karen Baldwin Kravetz (ct19665)
Susman, Duffy & Segaloff, P.C.
P.O. Box 1684
New Haven, Connecticut 06507-1684
Phone:  (203) 624-9830
Fax: (203) 562-8430
e-mail: kkravetz@susmanduffy.com
Its Attorney

## CERTIFICATION

I hereby certify that on June 18, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

  /s/ Karen Baldwin Kravetz
Karen Baldwin Kravetz (ct19665)
Susman, Duffy & Segaloff, P.C.
P.O. Box 1684
New Haven, Connecticut 06507-1684
Phone:  (203) 624-9830
Fax: (203) 562-8430
e-mail: kkravetz@susmanduffy.com
Its Attorney